UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHAWN A. SMITH,                    :
                                   :CIVIL ACTION NO. 3:16-CV-2085
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
NANCY A. BERRYHILL,[1]             :
Acting Commissioner of            :
Social Security,                   :
                                   :
          Defendant.               :
                                   :
_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the

Commissioner's denial of Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Supplemental Security

Income ("SSI") under Title XVI.  (Doc. 1.)  Plaintiff filed

applications for benefits in February 2013, alleging a disability

onset date of May 22, 2011.  (R. 14.)  After Plaintiff appealed the

initial denial of the claims, a hearing was held on December 11,

2014, and Administrative Law Judge ("ALJ") Sharon Zanotto issued

her Decision on May 7, 2015, concluding that Plaintiff had not been

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social
Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure which addresses the substitution of parties when a public
officer is replaced, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this
suit.  Fed. R. Civ. P. 25(d).  No further action needs to be taken
to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states
that "[a]ny action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying
the office of Commissioner of Social Security or any vacancy in
such office."

under a disability during the relevant time period.[2]  (R. 23.)
Plaintiff requested review of the ALJ's decision which the Appeals
Council denied on July 12, 2016.  (R. 1-3.)  In doing so, the ALJ's
decision became the decision of the Acting Commissioner.  (R. 1.)

Plaintiff filed this action on October 17, 2016.  (Doc. 1.)
He asserts in his supporting brief that the Acting Commissioner's
determination should be reversed or remanded for the following
reasons: 1) the ALJ did not acknowledge and identify how she
evaluated all medically determinable impairments established by the
record; 2) the ALJ did not properly evaluate opinion evidence; and
3) the ALJ did not properly evaluate witness statements.  (Doc. 9
at 7.)  After careful review of the record and the parties'
filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was born on July 2, 1980, and was thirty years old
on the alleged disability onset date.  (R. 22.)  He has a high
school education and past relevant work as a wax molder.  (R. 21-
22.)

### A.   *Mental Impairment Evidence*[3]

Plaintiff began treating with Psychiatrist Yury Yaroslavsky,

---

[2]  Plaintiff did not appear for the hearing.  (R. 14.)  In
response to the Notice to Show Cause for Failure to Appear,
Plaintiff responded that he did not have access to transportation.
(R. 14, 133.)

[3]  Plaintiff's claimed errors relate to his mental health
impairments.  (*See* Doc. 9 at 8-21.)  Therefore, the Court focuses
on evidence related to Plaintiff's claimed mental impairments.

M.D., at T.W. Ponessa & Associates Counseling Services, Inc., on June 20, 2011.  (R. 270-71.)  The Psychiatric Evaluation shows that Plaintiff reported a history of ADHD and behavioral problems as a teenager, and also

> sharp but relatively short periods of depression, generally lasting for a few days only.  During this period of time, he feels that he is not well functioning.  He forced himself to go to work but was generally late and felt very slow during those periods of time. . . . There is a history of one longer episode of depression.  He was admitted at the age of 13 when he tried to cut his wrist. . . . [H]e doesn't remember details. . . . In terms of depression, he admitted a history of "hyperness," during these periods which lasted for only a few hours.  He can't sit still. . . . He denied any changes in sleep, with increased energy, euphoric mood, increased and goal oriented activities.  He is concerned that he may have a bipolar period.  He denied any history of psychosis or violence. . . . He described lately being quite irritable.  He just recently terminated his job after he almost physically attacked his boss.  According to the patient, it was a minor argument that shouldn't have ended up in such an outburst.  The patient remembered throwing tools around, pushing his boss, etc.  The patient described over the course of his work with this employer for seven years that this was the third incident with three different people there.  The patient was given the option to be laid off, be terminated or voluntarily resigning.  He chose to resign and is currently at home.  He continues to experience some mood swings.  Just recently, he was playing a game and got very irritable.  He threw his controller into the wall.  He denied any recent suicidal or homicidal ideations.

(R. 270.)  Dr. Yaroslavsky found that Plaintiff presented as

3

pleasant, cooperative and overweight.  (R. 271.)  His Mental Status findings included the following: no significant distress; slightly avoidant eye contact; fluent and coherent speech; minimal psychomotor slowness and difficulty concentrating and staying on subject; no delusions or hallucinations of any kind endorsed; linear thought process; fair insight and judgment; alert and oriented times three; average "fund of knowledge of intelligence"; slightly decreased concentration; intact memory; and appropriately dressed, well groomed and kept.  (*Id.*)  Dr. Yaroslavsky assessed Mood Disorder, NOS, and History of Attention Deficit Hyperactivity Disorder with Axis IV considerations identified as unemployment, limited access to medical care, and interpersonal difficulties, and a current GAF of 55.  (*Id.*)  He started Plaintiff on Celexa for depressive symptoms and Depakote for mood stabilization and impulse control.  (*Id.*)  Plaintiff was to start individual psychotherapy and return in four weeks for medication management.

Plaintiff saw Dr. Yaroslavsky several times over the summer. (R. 264-69.)  During this period, Dr. Yaroslavsky's Diagnosis, including the assessed GAF, remained the same.  (R. 264, 266, 268.) On September 6, 2011, Plaintiff described himself as doing quite well.  (R. 264.)  He told Dr. Yaroslavsky that he had stopped the Depakote and felt the Celexa alone "alleviated pretty much his irritability." (*Id.*)  Mental Status examination showed the following: sufficient eye contact; linear thought process; fair

4

insight and judgment; and no behavioral problems or impulse control disorder. (*Id.*) Dr. Yaroslavsky also found that Plaintiff was fluent and coherent, and he was alert and oriented times three. (*Id.*)

Plaintiff discontinued treatment at T.W. Ponessa because he lost funding and cancelled appointments. (R. 245-46.) It was recommended that he contact Lebanaon County Mental Health/Mental Retardation/Early Intervention for services and support groups. (R. 246.)

Plaintiff resumed treatment at T.W. Ponessa in February 2012. (R. 262-63.) Plaintiff's diagnosis was the same as that recorded during his 2011 visits. (R. 262.) He reported that he was still somewhat depressed but felt that he was doing much better. (*Id.*) Mental Status findings included the following: euthymic mood; linear thought process; no delusional thought content; no hallucinations of any kind; no suicidal or homicidal ideations; mood described as depressed; constricted affect; no abnormal or involuntary movements; no impulsivity; and current irritability denied. (*Id.*) Plaintiff declined the need for individual psychotherapy. (R. 263.)

On March 26, 2012, Plaintiff reported that he was doing well, he was sleeping well, and his mood was stable. (R. 260.) Dr. Yaroslavsky noted that neither Plaintiff nor his girlfriend complained about him being irritable. (*Id.*) In April, he

described himself as doing well except for multiple stressors.  (R. 258.)  Dr. Yaroslavsky also noted that Plaintiff was "overall quite appropriate," his mood and affect were close to euthymic but his affect also appeared somewhat blunted, his eye contact was limited, his thought content showed some poverty, and his insight and judgment were limited to fair.  (*Id.*) Plaintiff again declined the need for psychotherapy.  (R. 259.)

Periodically, Plaintiff presented to Dr. Yaroslavsky with increased stress and decreased functioning (*see* R. 254, 256) but he continued to decline individual psychotherapy (*see* R. 255, 257). However, in October 2012, Plaintiff described himself as "doing quite well" and said his mood was good.  (R. 252.)

In October and November 2012, Plaintiff had three visits to Annville Family Medicine, P.C., where he was seen by George Loose, D.O.  (R. 285-86, 287-88, 289-90.)  At each visit he was reported to be alert and oriented times three with his affect appropriate. (R. 285, 287, 289.)

On January 14, 2013, Plaintiff had his last visit with Dr. Yaroslavsky, who was leaving the practice.  (R. 250-51.)  Plaintiff complained about an increase of anxiety and insomnia, and he was bothered by nightmares.  (R. 250.)  Dr. Yaroslavsky recorded the following Mental Status: Plaintiff appeared pleasant, cooperative, and mildly disheveled; eye contact limited; Plaintiff looked obstinate; he described his mood as somewhat depressed; he showed

some poverty of thought content; he revealed no hallucinations or delusions of any kind; he denied being homicidal or suicidal; his insight and judgment were overall fair; his affect appeared blunted; and he was oriented times three. (*Id.*) Dr. Yaroslavsky noted that Plaintiff declined individual psychotherapy, he was relatively stable, and he would be seen again by another provider in three months. (R. 251.) His diagnosis remained Mood Disorder, NOS, and a history of ADHD. At Axis IV, he noted unemployment, limited access to medical care, and interpersonal difficulties. At Axis V, he noted a current GAF of 55.

At Plaintiff's visit with Dr. Loose on March 27, 2013, Plaintiff denied psychiatric symptoms. (R. 318.) Dr. Loose found that Plaintiff appeared healthy and well developed, there were no signs of acute distress, he was alert and oriented, and his facial expression appeared appropriate and relaxed. (R. 319.)

On May 13, 2013, Plaintiff returned to T.W. Ponessa and had his first visit with psychiatrist Vassili V. Arkadiev, M.D. (R. 298-99.) Plaintiff reported worsening mood swings and said they lasted up to four days, he felt his mind racing, and he felt hyper and unable to fall asleep. (R. 298.) Plaintiff said he completed high school but was in special classes for reading and math. (*Id.*) Dr. Arkadiev recorded the following Mental Status: fair to good grooming; intermittent eye contact; slightly guarded; soft, monotonous speech; poverty of thought content; good energy; alert

7

and oriented times three; fair long term memory; and intellect appeared below average. (*Id.*) Dr. Arkadiev noted that Plaintiff denied hopelessness or helplessness at the time; he reported that his mood was hyper; he denied suicidal or homicidal ideations; and he denied psychotic symptoms. (*Id.*) Dr. Arkadiev changed Plaintiff's diagnosis from Dr. Yaroslavsky's assessed Mood Disorder, NOS and History of ADHD (*see* R. 250) to "Bipolar Disorder, NOS vs. Bipolar II Disorder" and Borderline Intellectual Functioning. (R. 298.) At Axis IV, Dr. Arkadiev noted poor support, severe personal difficulties, and severe mental problems. (*Id.*) At Axis V, he assessed a current GAF of 50. (*Id.*)

In June, Plaintiff reported feeling better because his girlfriend got some money, but he also reported feeling anxious and having concentration problems. (R. 300.) Mental Status was similar to the preceding month, and Dr. Arkadiev's Axis I diagnosis and GAF assessment remained the same. (*Id.*)

In August, Plaintiff reported increased stressors because his girlfriend broke her back and he was exhausted trying to take care of her. (R. 302.) Dr. Arkadiev reported that Plaintiff burst into tears a couple of times during his appointment, he had poor eye contact, Plaintiff reported his mood was terrible, his thought process appeared to be "alogia, very concrete," his affect appeared constricted, depressed, and anxious, he admitted to low energy as well as problems with attention and concentration, he was alert and

8

oriented times three, and his intellect appeared to be below average. (R. 302.)

On October 8, 2013, Plaintiff reported that he felt "all right" but his affect appeared to be constricted and anxious, and the Mental Status was similar to that recorded in August except that Plaintiff admitted to episodes of visual, somatic, and auditory hallucinations which Dr. Arkadiev assessed to be pseudo hallucinations. (R. 305.) Dr. Arkadiev changed Plaintiff's diagnosis to Bipolar Disorder, NOS with psychotic symptoms. (*Id.*) Axis IV factors remained similar to those previously noted, and he assessed Plaintiff's current GAF to be 50-55. (R. 306.) Dr. Arkadiev planned to re-evaluate Plaintiff in about one month. (*Id.*)

Plaintiff did not return to see Dr. Arkadiev until January 24, 2014, at which time he reported that he had been doing well until he ran out of medication several days before his appointment. (R. 307.) Plaintiff said he was not feeling well, he had been having trouble sleeping since he stopped his medications, and he was having episodes of seeing shadows. (*Id.*) Dr. Arkadiev's Mental Status findings included the following: poor grooming; monotonous speech; very concrete, slowed thought process; constricted, anxious, and ambivalent affect; fair long term memory; fair to good insight and judgment; and he was alert and oriented times three. (*Id.*) He also noted that Plaintiff denied problems with

concentration and attention; he denied anhedonia, suicidal and homicidal ideation; he admitted to paranoid ideations; and he denied auditory hallucinations at the moment. (*Id.*) Dr. Arkadiev planned to restart Plaintiff on his medications and see him again in two months. (R. 308.)

Plaintiff complained to Dr. Arkadiev in February 2014 that he was having more hallucinations and he was still having paranoid ideations, mostly about his roommates. (R. 309.) Plaintiff reported feeling stressed and anxious, primarily because of conflict with his girlfriend and roommates. (*Id.*) Mental Status findings were similar to those recorded in January. (*See* R. 307, 309.) Dr. Arkadiev adjusted Plaintiff's medications and planned to see him again in one month. (R. 310.)

Plaintiff was discharged from treatment at T.W. Ponessa on July 31, 2014. (R. 311.) The Discharge Summary noted that Plaintiff was discharged because of non-compliance and he was last seen on May 31, 2014.[4] (*Id.*) The Summary reported the following Discharge Diagnosis: Axis I - Major Depressive Disorder, recurrent, moderate, Anxiety Disorder, NOS, R/O Post-Traumatic Stress Disorder, Attention-Deficit/Hyperactivity Disorder NOS; Axis IV indicates "[n]one reported"; and Axis V indicates a current GAF of 50. (*Id.*) It also stated that Plaintiff was given information

---

[4] There is no record of this office visit. The last Progress Notes from T.W. Ponessa in the record are from Plaintiff's February 21, 2014, visit with Dr. Arkadiev. (R. 309-10.)

about contacting other providers if he was interested in further treatment.  (*Id.*)

On July 23, 2014, Plaintiff had an office visit with Dr. Loose stating that the primary reason for his visit was that he was dismissed from T.W. Ponessa for appointment tardiness and he needed to get depression medication refills.  (R. 316.)  Plaintiff's history included depression, but at the time of the visit he denied difficulties concentrating, or frequent crying, fatigue, change in sex pattern, stress, suicidal thoughts, or excessive worry.  (*Id.*)  Dr. Loose found Plaintiff alert and oriented times three, and found his memory intact.  (R. 317.)  He diagnosed Bipolar Disorder NOS.  (*Id.*)

At his follow up visit with Dr. Loose in October 2014, Plaintiff's subjective presentation was similar.  (*See* R. 314, 316.)  Dr. Loose found that Plaintiff appeared healthy and well developed, he was alert and oriented times three, and his memory was intact.  (R. 315.)

**B.**   ***Opinion Evidence***

State agency consultant Mark Hite, Ed.D., completed a Psychiatric Review Technique ("PRT) and Mental Residual Functional Capacity Assessment for each application on April 16, 2013.  (R. 54-55, 57-59, 65-66, 67-69.)  He concluded that Plaintiff's medically determinable mental impairments were Organic Mental Disorders and Affective Disorders and both were severe.  (R. 55,

65.)  He found the following: Plaintiff had mild restrictions of activities of daily living; he had moderate difficulties in maintaining social functioning; he had moderate difficulties in maintaining concentration, persistence or pace; and he had no repeated episodes of decompensation, each of extended duration. (*Id.*)  Dr. Hite also concluded that Plaintiff could perform simple, routine, repetitive work in a stable environment.  (R. 59, 69.)

Other opinion evidence consists of various GAF scores assessed by mental health providers which range from 50 to 55 throughout the relevant time period.  (*See*, *e.g.*, R. 271, 250, 300, 306, 309.)

## C. *Hearing Testimony*

As noted above, Plaintiff did not appear at the December 11, 2014, hearing held by ALJ Zanotto and, in response to the Notice to Show Cause for Failure to Appear, he said he did not have transportation.  (R. 14, 133.)

Plaintiff's attorney stated that he believed Plaintiff's affective bipolar disorder was the primary diagnosis and treatment records from Dr. Yaroslavsky and Dr. Arkadiev document the episodic mental health issues that reportedly led him to lose his job when he blew up at his manager over something minor.  (R. 32-33.)

Vocational Expert Michael Kibler ("VE") testified concerning past relevant work and availability of jobs in the national economy.  (R. 36-43.)  ALJ Zanotto asked him to consider whether Plaintiff would be able to perform his past relevant work as a wax

molder

> assuming he were able to perform the full
> range of work at all exertional levels except
> that he were limited to jobs that required
> only occasional interaction with supervisors
> and no interaction with co-workers and the
> public. And by interaction, I'm talking
> about where you have to work in tandem with
> others rather than you, . . . pleasantries
> walking in and out of the break room or in or
> out of the building or into the restroom or
> something like that. But no work that would
> require tandem work or team work.

(R. 39.) The VE stated that he would be able to perform his past

work as a wax molder. (*Id.*) He also said that other work would be

available, such as industrial cleaner, bakery racker, and table

worker. (R. 39-40.)

ALJ Zanotto also recognized that one doctor had diagnosed

Plaintiff with Borderline IQ, and she asked Mr. Kibler if the

ability to do past work and the exemplary jobs would still remain

if the individual "were limited to work that could be learned

within one month in addition to the other limitations, repetitive,

short cycle tasks, and occasional decision-making; no jobs that

would require precise limits, tolerances or standards, directing,

controlling, planning activities of others or influencing people's

attitudes, opinions and judgments." (R. 40.) The VE responded

that all jobs would remain. (*Id.*)

Plaintiff's attorney asked the VE if the hypothetical included

that the individual threatened to physically attack a supervisor

whether that would be acceptable in the identified jobs. (R. 41.)

13

The VE responded that

> it would depend on how often it occurs and if
> he ever follows through with it.  I mean, I
> think if he just had one outburst where he
> threatened the supervisor, they might
> overlook it.  I think if it happened daily,
> for sure, weekly or even every month I think
> it could be an issue.

(*Id.*)  Upon further questioning by Plaintiff's attorney, the VE

said there was the possibility that the individual could lose his

job if the outburst happened only once and were bad enough.  (R.

41-42.)

## 4.  *ALJ Decision*

In her May 7, 2015, Decision, ALJ Zanotto made the following

Findings of Fact and Conclusions of Law:

> 1.  The claimant meets the insured status
>     requirements of the Social Security Act
>     through December 31, 2016.
>
> 2.  The claimant has not engaged in
>     substantial gainful activity since May
>     22, 2011, the alleged onset date (20 CFR
>     404.1571 et seq, and 416.971 et seq.).
>
> 3.  The claimant has the following severe
>     impairment: mood disorder (20 CFR
>     404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment
>     or combination of impairments that meets
>     or medically equals the severity of one
>     of the listed impairments in 20 CFR Part
>     404, Subpart P, Appendix 1 (20 CFR
>     404.1520(d), 404.1525, 404.1526,
>     416.920(d), 416.925 and 416.926).
>
> 5.  After careful consideration of the
>     entire record, the undersigned finds
>     that the claimant has the residual

14

functional capacity to perform a full
range of work at all exertional levels
but with the following non-exertional
limitations: only occasional interaction
with supervisors; no interaction with
co-workers and the public; no work in
tandem with others or that would require
team work; limited to repetitive, short-
cycle tasks; occasional decision-making;
no precise limits, tolerances, or
standards; no directing, controlling or
planning actions of others; and no
influencing people's opinions, attitudes
or judgements.

6.    The claimant is capable of performing
      past relevant work as a wax molder,
      D.O.T. #549.685-038, unskilled, SVP 2,
      light exertional level (heavy exertional
      level as performed by claimant).  This
      work does not require the performance of
      work-related activities precluded by the
      claimant's residual functional capacity
      (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a
      disability, as defined in the Social
      Security Act, from May 22, 2011, through
      the date of this decision (20 CFR
      404.1520(f) and 416.920(f)).

(R. 16-23.)  ALJ Zanotto alternatively concluded that other jobs

existed in the national economy that Plaintiff was able to perform.

(R. 22.)

     Other relevant portions of the ALJ's Decision will be

referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

     The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[5]  It is necessary for the

Commissioner to ascertain: 1) whether the applicant is engaged in a

substantial activity; 2) whether the applicant is severely

impaired; 3) whether the impairment matches or is equal to the

requirements of one of the listed impairments, whereby he qualifies

for benefits without further inquiry; 4) whether the claimant can

perform his past work; 5) whether the claimant's impairment

together with his age, education, and past work experiences

preclude him from doing any other sort of work.  20 C.F.R. §§

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment,

the ALJ makes a finding about the claimant's residual functional

---

[5]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four of the sequential evaluation process when the ALJ found that Plaintiff could perform his past relevant work.  (R. 21.) Alternatively, she found that jobs existed in significant numbers in the national economy which Plaintiff could perform.  (R. 22.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see*

*also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third

Circuit Court of Appeals further explained this standard in *Kent v.*

*Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise. A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence. Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion. *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted). The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to

analyze all evidence. If she has not done so and has not

sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979). In *Cotter*, the Circuit Court clarified that the ALJ must

not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by

19

substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ did not acknowledge and identify how he evaluated all medically determinable impairments established by the record; 2) the ALJ did not properly evaluate opinion evidence; and 3) the ALJ did not properly evaluate witness statements. (Doc. 9 at 7.)

## A.  Medically Determinable Impairments

Plaintiff first asserts that ALJ Zanotto did not acknowledge and identify how she evaluated all medically determinable impairments established by the record.  (Doc. 9 at 8.)  Defendant responds that the ALJ fully considered Plaintiff's mental impairments.  (Doc. 10 at 13.)  The Court concludes Plaintiff has not shown that reversal or remand in warranted on the basis alleged.

Plaintiff essentially argues that the ALJ erred at step two because she did not specifically consider all of Plaintiff's diagnosed mental health impairments and that the error was not harmless because the ALJ did not address the impairments as non-severe, each impairment has accompanying functional limitations, and if medically determinable impairments are not acknowledged at step two, the impairments are then not taken into account when the ALJ must consider all limitations from all medically determinable impairments, both severe and non-severe, in determining the claimant's RFC.  (Doc. 9 at 8-12; Doc. 13 at 1-5.)

Plaintiff accurately states that the only mental health impairment identified by the ALJ was mood disorder which she found to be severe--she did not specifically discuss any other mental health impairment as non-severe or not medically determinable at step two.  *(See id.*; R. 16-17.)  In explaining her step two conclusion, ALJ Zanotto stated that she was "cognizant of the

substantial overlap in symptomatology between different mental impairments, as well as the inherently subjective nature of mental diagnoses.  Accordingly, the undersigned found the claimant's mental impairments severe and considered the claimant's psychological symptoms and effect on functioning, regardless of the diagnostic label attached."  (R. 16-17.)

The record evidence reviewed above shows that Plaintiff was diagnosed with several mental health impairments and that his main mental health providers attached *different* diagnoses to his reported symptoms rather than adding to the diagnosis of the previous provider.  For example, Plaintiff was not diagnosed as having bipolar disorder and mood disorder at the same time. Rather, Dr. Yaroslavsky diagnosed mood disorder after Plaintiff described periods of depression and periods of "hyperness" and expressed a concern that he may have a "bipolar period" (R. 270-71) where Dr. Arkadiev, who followed Plaintiff after Dr. Yaroslavsky left T.W. Ponessa, diagnosed bipolar disorder at his first encounter with Plaintiff who reported worsening mood swings (R. 298-99).  Dr. Arkadiev did not add bipolar disorder to Dr. Yaroslavsky's mood disorder, he eliminated the mood disorder diagnosis.  (R. 298.)  Upon discharge from T.W. Ponessa, Plaintiff's diagnosis was neither mood disorder nor bipolar disorder--Major Depressive Disorder, recurrent, moderate, Anxiety Disorder, NOS, R/O PTSD, and Atttention-Deficit/Hyperactivity

Disorder NOS were identified.  (R. 311.)

    Given this diagnostic history and ALJ Zanotto's explanation
for her step two finding, particularly her consideration of
Plaintiff's "psychological symptoms and their effect on
functioning, regardless of the diagnostic label attached" (R. 17),
the Court cannot conclude that the claimed error is cause for
reversal or remand even if the ALJ did not comply with all
technical aspects of step two determinations.  Because the
disability inquiry focuses on the functional limitations associated
with an impairment, the label attached to an impairment becomes
secondary to consideration of the established limitations.  *See*,
*Garcia v. Comm'r of Soc. Sec.*, 587 F. App'x 367, 370 (9th Cir. 2014)
(citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Walker
v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) (not
precedential) ("Mere presence of a disease or impairment is not
enough[;] a claimant must show that his disease or impairment
caused functional limitations that precluded him from engaging in
any substantial gainful activity."); *Burnside v. Colvin*, Civ. A.
No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015);
*Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D.
Pa. Feb. 19, 2009).  Therefore, an error may be deemed harmless
where the ALJ considered the established functional limitations
when the inquiry proceeded beyond step two.  *See Salles v. Comm'r
of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not

23

precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).

In general terms, "[a]n error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (quoting *Rencheski v. Williams*, 622 F.3d 315, 341 (3d Cir. 2010)). The "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination" *Shineski v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted). (*Shineski* notes exceptions and qualifications not applicable here. *Id.*)

Plaintiff alleges harm because the ALJ did not discuss all diagnosed mental impairments as either severe or non-severe and, having not discussed them at all, the harmless error principle does not apply. (Doc. 13 at 4-5.) Plaintiff does not develop an argument that the ALJ's claimed step two error is *per se* harmful, and the Court does not find merit in her conclusory assertion. Though harmless error is most often discussed in terms of impairments the ALJ considered non-severe at step two, the principle noted in *Salles* is not necessarily inapplicable here: if the established functional limitations associated with the impairment are accounted for in the RFC, the error may be deemed harmless. *See* 229 F. App'x at 145 n.2. Because the ALJ specifically noted that she considered all psychological symptoms

and effects on functioning regardless of the diagnostic label attached (R. 17), further consideration is warranted to determine whether Plaintiff has shown actual harm.

Plaintiff asserts the claimed error is harmful because each impairment "affects a person differently and causes distinct difficulties." (Doc. 9 at 9 (citing *Diagnostic and Statistical Manual of Mental Disorders* 123-32, 217-21 (5th ed. 2013)).) While this may be true in the abstract, Plaintiff must show specific harm in this case on the basis alleged. In other words, because Plaintiff alleges that each impairment causes distinct difficulties, he must show how an impairment not discussed affected him differently than what was discussed by the ALJ. This is especially true given Plaintiff's diagnostic history, particularly the change in diagnosis rather than additional diagnosis assigned by Dr. Arkadiev and the T.W. Ponessa discharge diagnosis which is almost completely different from that diagnosed by either provider and is not accompanied by explanation. (*See*, *e.g.*, R. 250, 298, 311.)

Plaintiff next alleges that the claimed error is harmful because it affected subsequent steps of the evaluation process, asserting "the ALJ cannot appreciate limitations a condition causes if the ALJ does not recognize the condition exists." (Doc. 9 at 11.) Plaintiff first points to alleged record support for "extreme irritability, difficulty sleeping, difficulty controlling his

25

temper, mood swings, and anxiety." (*Id.*) He then notes that "as a result, he had difficulty getting along with others and had lost his job by physically threatening his boss over a minor incident." (*Id.* (citing R. 186-96, 197-207, 270).) Plaintiff also states the record shows he had "difficulty with math, reading and writing, concentrating, understanding, and had subaverage intellect and limited thought processes." (*Id.* (citing R. 226-28, 245-72, 298-312).)

Plaintiff does not provide record citation for the claimed "extreme irritability, difficulty sleeping, difficulty controlling his temper, mood swings, and anxiety." (*See* Doc. 9 at 11.) The review of evidence set out above shows that records from mental health providers contain documentation of these alleged symptoms. However, the record does not show that they are unique to a diagnosis not specifically discussed by the ALJ. Rather, extreme irritability, difficulty sleeping, difficulty controlling his temper, mood swings, and anxiety were all symptoms alleged by Plaintiff and recorded by Dr. Yaroslavsky, the psychiatrist who diagnosed Mood Disorder, the impairment specifically found and discussed by the ALJ. (*See*, *e.g.*, R. 250, 266, 268, 270.) Because these symptoms were associated with the impairment specifically found severe, Plaintiff has not shown that the ALJ's failure to address other mental impairments by name at step two affected later steps in the sequential evaluation process. Plaintiff's follow-up

claim that these symptoms resulted in Plaintiff's difficulty getting along with others and losing his job (Doc. 9 at 11) does nothing to support his claimed error because the job loss took place before Plaintiff's treatment by Dr. Yaroslavsky and relationship difficulties also preceded any change in diagnosis. (*See*, *e.g.*, R. 264, 270.)  Therefore, Plaintiff has not shown how later-recorded diagnoses would have warranted different consideration of the identified symptoms/functional limitations. Finally, because Plaintiff's RFC is consistent with an individual with a Borderline IQ diagnosis (R. 40), Plaintiff has not shown error in the ALJ's failure to specifically discuss Dr. Arkadiev's diagnosis of Borderline Intellectual Functioning (R. 298)--a diagnosis not identified by Dr. Yaraslovsky (*see*, *e.g.*, R. 250, 270) or noted on the T.w. Ponessa Discharge Summary (R. 311).

Plaintiff's failure to identify functional limitations not associated with Dr. Yaroslavsky's Mood Disorder diagnosis and/or considered by the ALJ in assessing Plaintiff's RFC also undermines his assertions of error relating the claimed step two deficiency with the ALJ's step three analysis and credibility determination (Doc. 9 at 12).  In the absence of specific claimed errors and arguments that Plaintiff met or medically equaled a listing or that the ALJ's credibility determination was not supported by substantial evidence, the Court agrees with Defendant that further consideration of these issues is not warranted.  (*See* Doc. 10 at 16

nn. 4, 5.)

**B.    *Opinion Evidence***

Plaintiff contends the ALJ erred because she relied on opinion evidence which did not support her findings, *i.e.*, the opinion of Dr. Hite, the State agency psychological reviewer.  (Doc. 9 at 13.) Defendant responds that substantial evidence supports the weight afforded the medical opinions of record.  (Doc. 10 at 16.)  The Court concludes Plaintiff has not shown the claimed error is cause for reversal or remand.

Plaintiff first asserts the ALJ erred by rejecting the GAF scores assessed by Dr. Yaroslavsky and Dr. Arkadiev "indicating serious symptoms and likely precluded full time work activity and relying on speculative opinions made after review of an incomplete record."  (Doc. 9 at 13-14.)  Seeing a conflict between Dr. Hite's opinion and the treating specialists' assessments, Plaintiff alleges that the ALJ failed to resolve the conflict and the State agency opinion, as one piece of evidence, was not sufficient to reject "overwhelming evidence to the contrary."  (Doc. 9 at 14-15.)

Plaintiff's basic assertion and related arguments are flawed for several reasons.  First, he has not shown that the ALJ erred by rejecting the GAF scores assessed by Dr. Yaroslavsky and Dr. Arkadiev (Doc. 9 at 13).  Second, he has not shown that the ALJ relied only on "speculative opinions made after review of an incomplete record," *i.e,* Dr. Hite's opinion (*id.* at 13-14).  Third,

he has not shown that treating providers contradicted Dr. Hite's opinion and provided "overwhelming evidence to the contrary" (*id.* at 15). Fourth, he has not shown that the ALJ incorrectly accorded some weight to Dr. Hite's opinion (*id.* at 15; Doc. 13 at 8-9).

A review of current thinking on the importance and use of GAF scores is appropriate here. A GAF score was traditionally used by "mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults." *See Irizarry v. Barnhart*, 233 F. App'x 189, 190 n.1 (3d Cir. 2007). The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest.[6] *See Debaise v. Astrue*, No. 09-0591, 2010 WL 597488, at *5 n.7 (W.D. Pa. Feb. 16, 2010); s*ee also Diagnostic and Statistical Manual of Mental Disorders,* 32-34 (4th ed. text rev. 2000) ("DSM-IV"). In this case, moderate limitations

---

[6] A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM-IV at 34. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.* A GAF score of 71-80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning. *Id.*

represented by GAF scores of 51-60 and serious limitations represented by GAF scores of 41-50 are relevant.

Pursuant to Social Security Administration rules, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." *Watson v. Astrue*, Civ. A. No. 08-1858, 2009 WL 678717, at *5 (Mar. 13, 2009) (citing 66 Fed. Reg. 50746, 50764-65 (2000)). While the significance and use of GAF scores has been debated since the GAF scale was eliminated from the Diagnostic and Statistical Manual of Mental Disorders, an ALJ is not precluded from considering GAF scores as evidence. As explained in *Forster v. Colvin*, Civ. A. No. 3:13-CV-2699, 2015 WL 1608741 (M.D. Pa. Apr. 10, 2015),

> "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual [of Mental Disorders] ("DSM-5")." *Solock ex rel. F.A.R.P v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders 5d,* 16 (2013)). "It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders, DSM-516 (5th ed. 2013). In response, the Social Security Administration now allows ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and thus an ALJ should not "give

> controlling weight to a GAF from a treating
> source unless it is well supported and not
> inconsistent with other evidence." SSA
> AM-13066 at 5 (July 13, 2013).

2015 WL 1608741 at 9 n.2.  The Third Circuit Court of Appeals concluded an ALJ's failure to discuss two GAF scores of 50 did not warrant remand in *Rios v. Commissioner of Social Security*, 444 F. App'x 532, 535 (3d Cir. 2011) (not precedential), but the Circuit Court distinguished the situation from cases where the failure to discuss relevant GAF scores was deemed error because an ALJ is not permitted to "cherry pick" GAF scores in support of his decision or ignore medical evidence that runs counter to his finding.  *Rios*, 444 F. App'x at 535 (citing *Dougherty v. Barnhart*, No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006) (citations omitted)).

Under the relevant legal framework, an ALJ has great latitude in how GAF scores are considered.  Thus, harmful error on the basis alleged is rare unless an ALJ cherry picks scores and relies on those supporting a finding of no disability.  *See Rios*, 444 F. App'x at 535.  Here ALJ Zanotto did not cherry pick GAF scores, she referenced the range of scores found by treating providers and explained why she did not find them more probative than treatment records.  (R. 20-21.)  Specifically, she noted that Plaintiff's GAF scores of 50-55 were indicative of serious to moderate symptoms, stated why GAF scores are of limited evidentiary value, and found that treatment records show more because they demonstrate

Plaintiff's improvement and effective response to medication. (*Id.*) This consideration is consistent with the guidance provided by the Social Security Administration and relevant caselaw.[7]

Plaintiff has not shown that the ALJ's erred in reliance on treatment records rather than GAF scores in that he has not shown error in her assessment that Plaintiff showed improvement and effective response to medication (R. 20-21). The evidence reviewed in the Background section above shows that Plaintiff at times needed medication adjustments and experienced exacerbation of

---

[7] As a factual matter, though Plaintiff states that he had GAF scores "primarily of 50," the record shows that he was assessed with a GAF score of 50 at five visits with a treating provider (R. 298, 300, 302, 307, 309) and a GAF score of 55 at eleven visits (R. 250, 252, 254, 256, 258, 260, 262, 264, 266, 268, 271). At a Psychiatric Evaluation on October 8, 2013, Dr. Arkadiev assessed Plaintiff's current GAF to be 50-55. (R. 305.) The lower GAF scores were first assessed when Dr. Arkadiev began to treat Plaintiff in May 2013 (R. 298) and by October 8, 2013, he assessed a GAF of 50-55. At the October visit, Plaintiff reported that his sleeping was good, he denied significant mood swings, and he thought his medications were helping him. (R. 304.) Though Plaintiff was to return to see Dr. Arkadiev in one month, he did not return for over three months--on January 24, 2014, he reported that he was "doing well until he ran out of medication." (R. 307.) At the January and February 2014 visits, Plaintiff's GAF was again assessed to be 50. (R. 307, 309.) The February Progress Notes are the last of record from T.W. Ponessa.

This review of GAF-related record evidence shows that Plaintiff was assessed to have moderate symptoms more than serious symptoms and Plaintiff's assertion that the assessments of Dr. Yaroslavsky and Dr. Arkadiev "included GAF scores primarily of 50" (Doc. 9 at 13) is inaccurate. Because Plaintiff was more often assessed to have moderate symptoms, his statement that his GAF scores "likely precluded any full time work activity" (*id.*) is also inaccurate.

symptoms when not taking his medication or when he had additional stress in his personal life. (*See*, *e.g.*, R. 302, 307, 309.) However, both treating psychiatrists recorded improvement with medication compliance and Plaintiff himself noted that he was doing well when he took his medications.[8] (*See* R. 260, 264, 304, 307.) Thus, Plaintiff has not shown that the ALJ erred in her observation regarding improvement and effective response to medication.

Plaintiff's statements that the ALJ relied only on "speculative opinions made after review of an incomplete record," *i.e,* Dr. Hite's opinion, and that Dr. Hite's opinion alone "does not provide substantial evidence to find that the claimant is not disabled" (Doc. 9 at 14 (citing *Morales*, 225 F.3d at 317)) do not support his claim of error regarding the ALJ's assessment of opinon evidence. The foregoing discussion and a review of the Decision show that ALJ Zanotto relied on more than the State agency doctor's

---

[8]   The Court's conclusion that the ALJ did not err in her consideration of GAF scores and her finding that records demonstrate that Plaintiff showed improvement and effective response to medication is bolstered by records she did not specifically discuss, *i.e.,* Plaintiff's treatment for his mental health problems after he was discharged from T.W. Ponessa. (*See* R. 315-317.)  As set out in the Background section of this Memorandum, Plaintiff visited Dr. Loose in July 2014 stating that he had been dismissed from T.W. Ponessa for appointment tardiness and needed "depression meds." (R. 316.)  Plaintiff said he had a history of depression and needed medications but denied associated difficulty concentrating, frequent crying, change in sex pattern, stress, suicidal thoughts, and excessive worry. (*Id.*)  He reported the same in October 2014, and, at both visits, Dr. Loose found Plaintiff to be alert and oriented times three, with intact memory. (R. 315, 317.)

opinion to find that Plaintiff was not disabled.  She reviewed evidence of record and relied on treatment notes and activities of daily living as well as Dr. Hite's opinion in assessing Plaintiff's RFC.  (R. 19-21.)  She concluded, after consultation with a Vocational Expert, that Plaintiff had the RFC for a full range of work at all exertional levels with certain non-exertional limitations, some of which are consistent with Dr. Hite's findings and others which related to his claimed limited intellectual functioning.  (R. 18, 39-40, 57-59, 67-69.)  This RFC formed the basis for the determination at step four that Plaintiff was able to perform past relevant work as a wax molder or alternatively, at step five, that he could perform other jobs available in significant numbers in the national economy.  (R. 21-23.)  Thus, contrary to Plaintiff's contention, ALJ Zanotto relied on far more than the State agency non-examining opinion to determine that Plaintiff was not disabled.

Though Plaintiff continually asserts that the mental health professionals believed he was unable to work (*see*, *e.g.*, Doc. 9 at 14, 15), this is an averment not supported by the record.  The Court's previous review of GAF score considerations shows that GAF scores alone are not dispositive and, to the extent they would be considered here, they weigh more in favor of moderate symptoms. *See supra* n.7. Furthermore, the record shows that neither treating psychiatrist opined that Plaintiff was unable to work.  Defendant

correctly notes that neither Dr. Yaroslavsky nor Dr. Arkadiev "provided an opinion restricting Plaintiff's ability to work or opined as to any mental functional limitations for Plaintiff."[9] (Doc. 10 at 18.) Therefore, Plaintiff has not shown that treating mental health professionals contradicted Dr. Hite's opinion.

Although the Court has concluded that ALJ Zanotto relied on more than Dr. Hite's opinion in assessing Plaintiff's RFC and ultimately determining that Plaintiff was not disabled, Plaintiff's argument in his reply brief that the ALJ's decision is not supported by substantial evidence because Dr. Hite did not review Dr. Arkadiev's treatment notes and psychiatric evaluation (Doc. 13 at 6) warrants some discussion in that Plaintiff infers that the ALJ should have accorded the opinion no weight. This inference is not supported by fact or law.

Plaintiff recognizes that there is no inherent problem in crediting a State agency opinion which has not taken into consideration all evidence of record--a problem only arises when records not considered show that the claimant's condition deteriorated significantly. (*Id.* at 8 (citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)).) Plaintiff

---

[9] Though not discussed by the ALJ, Dr. Yaroslavsky's diagnoses consistently included "unemployment" at Axis IV. (R. 250, 252, 254, 256, 258, 260, 262, 264, 266, 268, 271.) Axis IV identifies psychosocial and environmental problems, www.psyweb.com/DSM_IV/jsp/Axis_IV.jsp. To the extent Dr. Yaroslavsky believed unemployment to be a problem, no inference can be drawn that he did not consider Plaintiff capable of working.

specifically points to Dr. Hite's findings that Plaintiff was not suffering from delusions or hallucinations and that his insight and judgment were fair (Doc. 13 at 8 (citing R. 55) as evidence of a significantly changed condition.

Dr. Hite's PRT explained that Dr. Yaroslavsky reported in his records that Plaintiff did not have delusions or hallucinations and his judgment and insight were fair. (R. 55.) After having seen Plaintiff three times beginning in May 2013, Dr. Arkadiev notes for the first time in October 2013 that Plaintiff subjectively "admits to visual hallucinations or probably pseudo hallucinations" and under "Mental Status," he again reported that Plaintiff "admits" to hallucinations "but not at this moment" and he found Plaintiff's insight and judgment to be limited. (R. 304-05.) Over three months later, Plaintiff reported that he had been doing well until he ran out of medication, he denied auditory hallucinations, and he reported episodes of seeing shadows but not as frequent as before. (R. 307.) Dr. Arkadiev found Plaintiff's judgment and insight to be fair to good. (*Id.*) The following month Plaintiff reported more hallucinations and his insight and judgment were assessed to be fair to limited. (R. 309.)

Because Plaintiff reported hallucinations for the first time to Dr. Arkadiev, records from the three office visits cited show some change in Plaintiff's reported condition in that he had not admitted hallucinations to Dr. Yaroslavsky. (*See*, *e.g.*, R. 250.)

However, the short-term admission to hallucinations interspersed with Plaintiff's report during his hiatus from treatment that he was doing well until he ran out of medication and followed by his discharge from treatment for non-compliance (R. 307, 311) cannot be deemed evidence that Plaintiff's condition "changed significantly" after Dr. Hite rendered his opinion. *See supra* n.8.

Regarding insight and judgment, a comparison of the objective assessments of Dr. Yaroslavsky and Dr. Arkadiev do not show the change suggested. Dr. Yaroslavsky occasionally assessed Plaintiff's insight and judgment to be fair to limited (R. 254, 256, 258) and Dr. Arkadiev on occasion found Plaintiff's insight and judgment to be in this range as well as finding them to be fair to good on another occasion. (R. 307, 309.) The similarity between the providers' insight and judgment findings do not show a significant change in Plaintiff's condition.

More generally, as discussed above, the record shows intermittent deterioration in Plaintiff's condition but it also contains evidence supporting the ALJ's assessment that Plaintiff's condition improved and he responded to treatment. Because Plaintiff has not shown that his condition deteriorated significantly, he has not provided a basis for the Court to conclude that the ALJ improperly assigned weight to Dr. Hite's opinion.

In his reply brief, Plaintiff asserts for the first time that

37

the ALJ's discussion of Dr. Arkadiev's treatment records is deficient because she did not discuss certain observations made by Dr. Arkadiev and these observations should have been given controlling weight. (Doc. 13 at 5-8.) To the extent this is a new argument raised in a reply brief, it does not warrant consideration. *See*, *e.g.*, *Tursky v. Colvin*, Civ. No. 14-03241, 2015 WL 4064707, at *33 (D.N.J. July 2, 2015) (citing *United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996); *Int'l Raw Materials, Ltd. v. Stauffer v. Chem Co.*, 978 F.3d 1318, 1327 n.11 (3d Cir. 1992); *Stern v. Halligan*, 158 F>3d 729, 731 n.3 (3d Cir. 1990); *Balias v. Tedesco*, 41 F. Supp. 2d 531, 533 n.3 (D.N.J. 1999)).[10]

## C.  Witness Statement

Plaintiff asserts that the ALJ did not properly evaluate a witness statement from Plaintiff's mother, Doris Ramsey. (Doc. 9 at 16 (citing R. 186-96).) Defendant maintains the ALJ properly weighed this evidence. (Doc. 10 at 21.) The Court concludes Plaintiff has not shown that the claimed error is cause for remand

---

[10]  To the extent the ALJ did not discuss Dr. Arkadiev's observations cited by Plaintiff (Doc. 13 at 7), Plaintiff has not shown that she "does not address the majority of findings from Dr. Arkadiev, choosing, instead, to discuss only the limited notes that support the ALJ's decision" (Doc. 13 at 8). The ALJ specifically noted treating providers' findings of poor eye contact, constricted affect, complaints of auditory hallucinations, soft speech, impaired sleeping, and low energy--findings that do not necessarily support her decision. Furthrmore, as discussed in the text, the ALJ incorporated into the RFC nonexertional limitations related to Dr. Arkadiev's mental functioning observations.

or reversal.

Although, as noted by Defendant, the regulations and Social Security Rulings speak in permissive terms regarding consideration of evidence from non-medical sources (Doc. 10 at 22 (citing 20 C.F.R. §§ 404.1513, 416.913; SSR 96-7p, 1996 WL 374186, at *8)), the Third Circuit Court of Appeals requires an ALJ to consider and weigh all of the non-medical evidence before her, *Burnett*, 220 F.3d at 122 (citation omitted).

ALJ Zanotto considered Ms. Ramsey's Function Report and stated

> the claimant's mother wrote that the claimant was bipolar and became upset easily, and the claimant's impairments affected hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. ([R. 186-96].) Such statements are not from accepted medical experts under Social Security regulations, but are lay opinions and observations of a claimant's functioning that the undersigned considered (SSR-06-03p). The undersigned gives little weight to this exhibit as it consists of casual observation, rather than objective medical testing. Ultimately, they are unpersuasive for the same reasons that claimant's own allegations do not fully persuade the undersigned, observing that they lack substantial support from objective findings in the record. However, the undersigned notes that the claimant's mother also observed activities of daily living, as described above, that were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations, as the claimant performed adequate activities of daily living and socialized and interacted appropriately.

(R. 21.)

Plaintiff states the ALJ "accorded the statements limited weight because 'it consists of casual observation, rather than objective medical testing' (R. 21). That was the only rationale the ALJ provided for rejecting the statements. The ALJ committed legal error." (Doc. 9 at 16-17 (citing *Seese v. Astrue*, 4:10-cv-02169 (M.D. Pa. Dec. 13, 2011) (ALJ cannot reject witness statement due to close relationship with claimant).)

The Decision excerpt quoted above clearly shows that ALJ Zanotto provided several reasons for assigning little weight to Ms. Ramsey's statement. Thus, Plaintiff has not shown that the ALJ ran afoul of the requirements concerning such statements.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly denied. An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: May 8, 2017